UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHAWN WESTFAHL, | ) | |
| | ) | |
| PLAINTIFF | ) | Case No. 1:11-cv-2210 (RLW) |
| vs. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.,* | ) | |
| | ) | |
| DEFENDANTS | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

### THE PARTIES

1.      Plaintiff Shawn Westfahl is a Pennsylvania citizen residing at 534 S. 4th St. 3, Philadelphia, PA 19147.

2.      Defendant District of Columbia is a municipal corporation.

3.      Defendants D.C. Metropolitan Police Officers Daniel Thau, Todd Cory, and D.C. Metropolitan Police Sgt. Craig D. Mack are and were at all times referenced herein employees of the Metropolitan Police Department (MPD), an agency of the District of Columbia, acting within the scope of their employment.  Defendant Officer Robert Robinson is a former employee of the MPD, and was at all times referenced herein an employee of MPD acting within the scope of his employment.

### JURISDICTION

4.      This action arises under 42 U.S.C. § 1983 and under the common law.

5.      This court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. § 1331 and 1367.

6.     Venue is proper in this district pursuant to 28 USC §§ 1391(b)(2) because the events or omissions giving rise to this action occurred in the District of Columbia.

<u>STATEMENT OF FACTS</u>

*Arrest and Use of Excessive Force*

7.     On the night of October 9, 2010, Plaintiff was marching in a protest against the World Bank and International Monetary Fund (WB/IMF) when the individually named Defendants, without provocation, began deliberately assaulting him, including striking him with their fists and weapons (asps), causing him physical injuries, pain and emotional injuries. To the extent any of the individually named Defendants did not personally assault and batter  Plaintiff as described, those Defendants nevertheless participated in the assault and battery on Plaintiff and causing injury to him by knowingly allowing the assault and battery to occur and failing to take any steps to prevent or halt it, contrary to the duty they owed to Plaintiff.  Through these events, Plaintiff was unarmed, defenseless, made no furtive moves or gestures, and repeatedly told the Defendants that he was not resisting.

8.     The above described events and unnecessary and unreasonable use of force against the Plaintiff was the result of the policies, practices and customs of the MPD to inadequately supervise and discipline law enforcement officers who use excessive force, and to inadequately train law enforcement officers on the use of force and proper police conduct under the circumstances such as existed at the time of the events described in this pleading.

9.     The inadequate training, supervision and discipline of police officers by the MPD has led to the unnecessary and illegal use of excessive force such as occurred on October 9, 2010, the failure of  police officers to intervene and protect private citizens

2

when their fellow police office in their presence is engaged in excessive force such as occurred on October 9, 2010, and the failure of police officers to report the illegal activity of their fellow police officers such as occurred regarding the events of October 9, 2010.

10.     The policy, practice and custom of the MPD with respect to the standard "use of force investigations" that should have been conducted into the events of October 9, 2010, is to conduct a minimal investigation designed to exonerate the officer involved rather than a reasonably thorough investigation to discover the true facts of the incident which was required but not undertaken with respect to the events of October 9, 2010.

11.     As a result of the above, MPD employees reasonably concluded that their use of excessive force such as occurred on October 9, 2010 will not result in discipline, termination, or criminal prosecution against them.

12.     In an attempt to cover up the illegal and brutal treatment of Plaintiff, Defendant Officer Todd W. Cory falsely reported that Plaintiff Mr. Westfahl had struck another MPD officer in the head with a wooden stick and attempted to resist being handcuffed.  Plaintiff Mr. Westfahl did not strike anyone, with or without a stick, and did not attempt to resist being handcuffed.  The remaining individual Defendants were aware of Defendant Officer Cory's false report and condoned and adopted his conduct by failing to take any steps to correct this wrongful action.  Plaintiff was arrested without a warrant and charged with Assault on a Police Officer (misdemeanor) and Attempted Possession of a Prohibited Weapon.  The charges were subsequently dismissed for want of prosecution.

*Failure to Adequately Investigate Use of Force and Discipline MPD Officers: The Department of Justice Investigation and Memorandum of Agreement*

13.     The United States Department of Justice, aided by nationally recognized experts in police use of force, reviewed reported use of force by MPD during the period of 1994 through early 1999.  During this period, approximately 1,400 incidents involving uses of force by MPD officers were reported.  This figure does not account for all uses of force occurring during the period under review because MPD did not at that time require that officers report and supervisors review all uses of force.

14.     The Department of Justice also examined MPD's management practices related to use of force including its use of force policies and disciplinary system.  The Department of Justice notified MPD during the course of the investigation when it identified deficient policies, practices, or procedure and provided technical assistance recommendations aimed at improving the identified problem.

15.     The Department of Justice uncovered serious shortcomings in the quality of MPD use of force investigations.  The Department of Justice identified to MPD its concerns about the competency, thoroughness, and impartiality of use of force investigations.  For example, the Department of Justice found instances in which investigators failed to interview victims, suspects, or MPD or civilian witnesses.

16.     The Department of Justice advised that these failures may derive from inadequate training for use of force investigators (usually lieutenants).  The Department of Justice recommended that MPD provide all of its use of force investigators with, at a minimum, training in the following: investigation techniques; observation and surveillance skills; basic forensics; interviewing and interrogation skills; report writing; basic criminal law; basic court procedures; basic rules of evidence; and MPD's disciplinary and administrative procedures.

17.     In addition, the Department of Justice observed that with the exception of investigations conducted by the Force Investigation Team, use of force investigations

were conducted by investigators from the district where the use of force occurred, a practice which can create conflicts of interest, particularly where the investigator and officer under investigation are personally acquainted or work together. The Department of Justice recommended, for these reasons, that for significant categories of cases, investigators not be based in the district in which the incident occurred.

18.     The Department of Justice also recommended that every supervisory review of a use of force include an assessment of the following issues: 1) was the force used in policy, reasonable, and necessary; 2) should the incident be investigated to determine whether misconduct occurred; 3) does the incident indicate a need for additional training, counseling or other remedial measures; and 4) whether the incident suggests that MPD should revise its policies, training, or tactics.

19.     The examination by the Department of Justice of MPD's use of force tracking system and associated policies and practices led the Department to conclude that MPD does not have a comprehensive program to minimize use of excessive force. As a result, MPD could not adequately identify officers or units who have, or may in the future, engage in excessive force or other misconduct. Without such identification, MPD could not fully manage the risks such officers in units pose.

20.     The Department of Justice observed that MPD's early warning system suffered from a number of deficiencies. First, it did not specifically capture officer use of force. Second, it was too limited in time as the database maintained information for only two years.   To address these and other deficiencies, the Department of Justice recommended that MPD begin to collect at one location all available data related to officer use of force, including: officer and supervisor reports on all uses of force; citizen complaints alleging use of excessive force; civil lawsuits alleging use of excessive force;

and the results of all investigations of and litigation regarding uses of force, including sustained/not sustained judgments, civil verdicts, and settlement amounts.

21.     The Department of Justice also examined MPD's system for disciplining officers who engage in excessive force because the timely and effective imposition of appropriate discipline is critical for preventing and controlling excessive force.

22.     The Department of Justice determined that MPD did not have an adequate disciplinary system in place to respond to use of excessive force.

23.     The Department of Justice received very few records in response to its request for all documents related to MPD's discipline of officers for use of excessive force, indicating that few officers are ever disciplined for excessive force.  For example, the documents provided indicated that in approximately 350 use of force incidents referred to the United States Attorney's Office for possible criminal prosecution, MPD recommended discipline for only 16 officers.  In many instances in which MPD held a use of force "unjustified," or in which MPD held a citizen complaint of excessive force "sustained," the Department of Justice did not receive any documents evidencing that MPD imposed any form of discipline.  From the documents MPD provided, it appeared that of 31 uses of force held by MPD to be unjustified, discipline was recommended in less than 50 percent of the cases.  Similarly, of 11 sustained citizen complaints of excessive force, discipline was recommended in only 7 cases.

24.     The Department of Justice recommended that MPD revise and update its disciplinary policies to ensure the timely imposition of adequate discipline for excessive force cases.  The Department of Justice also recommended that MPD establish a centralized system for documenting and tracking all disciplinary and corrective action.

25.     As a result of the Department of Justice investigation, MPD entered into a Memorandum of Agreement with the Department to improve its use of force investigations and update and revise its disciplinary policies.

26.     As a result of the Department of Justice investigation, the Department of Justice, the District of Columbia, and MPD, jointly entered into an agreement in order to, among other things, minimize the risk of excessive use of force.  The agreement was memorialized in a Memorandum of Agreement.

27.     MPD created the Force Investigation Team (FIT) to conduct fair, impartial and professional reviews of firearm discharges.

28.     Pursuant to the Memorandum of Agreement, MPD agreed to expand the role of the FIT to require the FIT to the scene of every incident involving deadly force, a serious use of force, or any use of force indicating potential criminal misconduct by an officer.  Further, MPD agreed that in each of these incidents, FIT would conduct the investigation of the use of force and that investigators from the involved officers' District would not conduct the investigation. MPD also agreed that based upon the review of use of force incidents from throughout MPD, FIT would forward policy and training recommendations to the Chief of Police or his or her designee.

29.     In order to ensure that the FIT could properly perform its role, MPD agreed that it would train and assign a sufficient number of personnel to FIT to fulfill the requirements of the Memorandum of Agreement.

30.     The Memorandum of Agreement permitted chain of command district supervisors to continue to investigate all use of force incidents except for those incidents involving a serious use of force, serious physical injury, or any use of force indicating potential criminal conduct by an officer.  MPD further agreed that at the conclusion of each use of force investigation, the investigator would prepare a report on the

investigation to include proposed findings and analysis supporting the proposed findings. The proposed findings would include the following: 1) a determination of whether the use of force is consistent and MPD policy and training; 2) a determination of whether proper tactics were employed; and 3) a determination whether lesser force alternatives were reasonably available.

31.     MPD agreed that upon completion of a chain of command use of force investigation, the investigator would forward the investigation to the Unit Commander, who would review the investigation to ensure that it is complete and that the findings are supported by the evidence. When the Unit Commander determines the investigation is complete and the findings are supported by the evidence, the investigation file would be forwarded to the Use of Force Review Board (UFRB).

32.     MPD also agreed that the UFRB would conduct timely reviews of all use of force investigations and act as a quality control mechanism for all use of force investigations, with the responsibility to assign to FIT, or return to the investigating unit, all incomplete or mishandled use of force investigations. MPD agreed to require the UFRB to conduct annual reviews of all use of force cases examined to detect patterns/problems and to issue a report to the Chief of Police with findings and recommendations.

33.     MPD still further agreed that in conducting administrative misconduct investigations (whether conducted by FIT, Chain of Command, or OPR, following a criminal declination, where applicable) MPD would, subject to and in conformance with applicable law, at a minimum:

> a.   tape record or videotape interviews of complainants, involved officers, and material witnesses in investigations involving a serious use of force or serious physical injury (if a complainant or non-officer

witness refuses to be tape-recorded or videotaped, then MPD would prepare a written narrative of the statement to be signed by the complainant or non-officer witness);

b. whenever practicable and appropriate, interview complainants and witnesses at sites and times convenient for them, including at their residences or places of business;

c. interview all appropriate MPD officers, including supervisors;

d. collect, preserve, and analyze all appropriate evidence, including canvassing the scene to locate witnesses and obtaining complainant medical records, where appropriate; and

e. identify and report in writing all inconsistencies in officer and witness interview statements gathered during the investigation.

34.     MPD agreed to develop a manual, subject to approval by DOJ, for conducting all MPD misconduct investigations. The manual would include timelines and provide investigative templates to assist investigators in gathering evidence, conducting witness interviews, and preparing investigative reports.

35.     MPD agreed to continue to make findings based on a "preponderance of the evidence" standard.

36.     MPD further agreed to require its Unit Commanders to evaluate all misconduct investigations to identify underlying problems and training needs. After such evaluations the Unit Commander would implement appropriate non-disciplinary actions, if any, or make a recommendation to the proper MPD entity to implement such actions.

37.     MPD agreed to create a Personnel Performance Management System ("PPMS"). In connection therewith, the District committed to develop and fully implement a computerized relational database for maintaining, integrating, and retrieving

data necessary for supervision and management of MPD and its personnel. The computerized data would be used regularly and affirmatively by MPD to promote civil rights integrity and best professional police practices; to manage the risk of police misconduct, and potential liability thereof; and to evaluate and audit the performance of MPD officers of all ranks, and MPD units, sub-units, and shifts. It would also be used to promote accountability and proactive management and to identify, manage, and control at-risk officers, conduct, and situations. MPD agreed that PPMS would be a successor to, and not simply a modification of, MPD's existing automated systems.

38.     MPD agreed that PPMS would contain information at minimum on the following matters, among others:

    a.   all uses of force that are required to be reported in MPD "Use of Force Incident Report" forms or otherwise are the subject of a criminal or administrative investigation by the Department;

    b.   all studies, reviews, or determinations with respect to the criminal, administrative, tactical, strategic, or training implications of any use of force, including all preliminary and final decisions regarding whether a given use of force was or was not within MPD policy;

    c.   all complaints (whether made to MPD or OCCR);

    d.   the results of adjudication of all investigations (whether criminal or administrative) and a chronology or other complete historical record of all tentative and final decisions or recommendations regarding discipline, including actual discipline imposed or non-disciplinary action taken;

    e.   all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City, or its

officers, or agents, resulting from MPD operations or the actions of MPD personnel.

f.   training history; and

g.   all management and supervisory actions taken pursuant to a review of PPMS information, including non-disciplinary actions.

39.   MPD also agreed that PPMS would include, for the incidents included in the database, appropriate additional information about involved officers (e.g., name and badge number), and appropriate information about the involved members of the public (including demographic information such as race, ethnicity, or national origin). Additional information on officers involved in incidents (e.g., work assignment, officer partner, field supervisor, and shift at the time of the incident) would be determinable from PPMS.

40.   MPD agreed that the protocol for using PPMS would include the following provisions and elements:

a.   The protocol would require that, on a regular basis, but no less than quarterly, managers, and supervisors review and analyze all relevant information in PPMS about officers under their supervision to detect any pattern or series of incidents that indicate that an officer, group of officers, or an MPD unit under his or her supervision may be engaging in at-risk behavior.

b.   The protocol would provide that when at-risk behavior may be occurring, appropriate managers, and supervisors would undertake a more intensive review of the officer's performance.

c.   The protocol would require that MPD and managers on a regular basis, but no less than quarterly, review and analyze relevant information in

PPMS about subordinate managers and supervisors in their command regarding the subordinate's ability to manage adherence to policy and to address at-risk behavior.

d.   The protocol would require regular review at no less than quarterly intervals by appropriate managers of all relevant PPMS information to evaluate officer performance citywide, and to evaluate and make appropriate comparisons regarding the performance of all MPD units in order to identify any patterns or series of incidents that may indicate potential liability or other at-risk behavior. These evaluations would include evaluating the performance over time of individual units, and comparing the performance of units with similar responsibilities.

e.   The protocol would require that all relevant and appropriate information in PPMS would be considered in connection with the adjudication of misconduct allegations and determinations of appropriate discipline for sustained misconduct allegations..

41.   MPD would train and thereafter hold managers, and supervisors accountable, consistent with their authority, for risk management and for use of PPMS and any other relevant data to address at-risk behavior, to deal with potential or actual police misconduct, and to implement the protocol described above.

*Failure to Adequately Investigate Use of Force and Discipline MPD Officers: Failure to Adhere to the Memorandum of Agreement in the Years After the Monitoring Period Ended*

42.   The monitoring period ended in 2008 and in June 2008 the Office of the Independent Police Monitor issued its final report.

43.     Whatever progress MPD may have made during the monitoring period when the Memorandum of Agreement was in effect, by 2010 MPD had reverted back to its prior practices, with serious deficiencies quickly re-arising with respect to its use of force investigations, early warning system, and disciplinary system.

44.     As a result of these deficiencies re-arising, excessive use of force increased in 2009 and 2010, reversing reductions that had occurred during the monitoring period.

45.     MPD failed to take steps to detect patterns with excessive use of force after the monitoring period ended and failed to take steps to curb excessive use of force after the monitoring period ended.

46.     Data from OPC, however, reflects that complaints of excessive use of force, including non-lethal force, were significantly higher in the period between the end of the monitor and the incident involving Plaintiff, as compared to the period prior to the end of the monitor.  In particular, there was a dramatic increase in complaints of excessive use of force, including non-lethal use of force, in 2009, the year after the monitoring period ended.

47.     From 2008 to 2010, MPD reverted back to its deficient, pre-monitoring practices in a number of areas.

48.     By 2010, FIT had an overwhelming number of cases and staffing problems.  As a result, FIT referred cases back to the District level which it should have handled itself.

49.     The expanded use of the FIT was one of the key reforms put into place by the MOA and MPD's failure to adequately staff it was deliberate indifference if not intentional disregard.

50.     At some point between 2010 and 2012, the FIT was formally abolished by the MPD.

51.     The use of force against SHAWN WESTFAHL is an example of one case which should have been handled by FIT but which was referred back to the District level.

52.     As a result of its overwhelming number of cases and staffing problems between 2008 and 2010, FIT was unable to adequately gauge patterns of excessive use of force to fulfill its duty to forward policy and training recommendations to the Chief of Police or his or her designee.

53.     In chain-of-command investigations into use of force incidents, between 2008 and 2010 investigators routinely failed to include in their proposed findings a determination whether lesser force alternatives were reasonably available.

54.     The chain-of-command investigation into the use of force incident involving SHAWN WESTFAHL is an example of an investigator failing to include in her proposed findings a determination whether lesser force alternatives were reasonably available.

55.     In chain-of-command investigations into use of force incidents, between 2008 and 2010 unit commanders routinely failed to forward the investigation file to the Use of Force Review Board (UFRB).

56.     As a result, during that period the UFRB was unable to conduct timely review of all use of force investigations, act as a quality control mechanism for all use of force investigations, determine whether investigations were incomplete or mishandled, conduct thorough annual reviews, detect patterns or problems, or issue adequate reports to the Chief of Police with findings and recommendations.

57.     Even if the UFRB was able to conduct a timely review of all use of force investigations, the DISTRICT OF COLUMBIA had an official policy, practice, or

14

custom of not using the UFRB as a quality control mechanism during the period 2008 to 2010. During that period, UFRB did no more than determine whether or not the use of force was justified.

58.     The chain-of-command investigation into the use of force incident involving SHAWN WESTFAHL is an example of a case in which the unit commander did not forward the investigation file to the UFRB.

59.     Between 2008 and 2010, MPD, in conducting administrative misconduct investigations (including chain-of-command), routinely failed to tape record or videotape interviews; collect, preserve, and analyze all appropriate evidence; canvass the scene to locate witnesses and obtain complainant medical records; and identify and report in writing all inconsistencies in officer and witness interview statements gathered during the investigation.

60.     The administrative misconduct investigation into the use of force incident involving SHAWN WESTFAHL is an example of a case in which MPD did not tape record or videotape interviews; did not collect, preserve, and analyze all appropriate evidence; did not canvass the scene to locate witnesses; did not obtain complainant medical records; and did not identify and report in writing all inconsistencies in officer and witness interview statements gathered during the investigation. Specifically, none of the defendants' interviews were tape recorded or videotaped; Officer Robinson's helmet was not preserved and analyzed; video of the incident was not reviewed; no MPD officer canvassed the scene to locate witnesses; MPD did not obtain SHAWN WESTFAHL's medical records; and numerous inconsistencies were not identified and reported.

61.     During the period 2008 to 2010, investigators who conduct chain-of-command use of force investigations were unfamiliar with the Chain of Command

Investigation Manual developed by MPD and therefore the development of the manual did nothing to improve the quality of use of force investigations.

62.     The chain-of-command investigation into the use of force incident involving SHAWN WESTFAHL involved an investigator, Lt. Terry-Weeks, who was unfamiliar with the Chain of Command Investigation Manual.

63.     During the period 2008 to 2010, MPD investigators did not consistently make findings based on a "preponderance of the evidence" standard.  Investigators routinely use the wrong standard or no standard because they are not trained on the "preponderance of the evidence" standard.

64.     The chain-of-command investigation into the use of force incident involving SHAWN WESTFAHL involved an investigator, Lt. Terry-Weeks, who did not a particular standard, but believed that in some circumstances the appropriate standard is "beyond a reasonable doubt."

65.     From 2008 to 2010, MPD's Unit Commanders did not evaluate all misconduct investigations to identify underlying problems and training needs.  During tha period, Unit Commanders did not implement appropriate non-disciplinary actions or make recommendations to the proper MPD entity to implement such actions.

66.     During the period 2008 to 2010, the Personnel Performance Management System ("PPMS") developed by MPD did not contain the data necessary for supervision and management of MPD and its personnel.

67.     During that period, PPMS was not used regularly or affirmatively by MPD to promote civil rights integrity and best professional police practices.  It was not used to manage the risk of police misconduct and potential liability thereof.  It was not used to evaluate and audit the performance of MPD officers of all ranks, and MPD units, sub-

units, and shifts.  It was also not used to promote accountability and proactive

management and to identify, manage, and control at-risk officers, conduct and situations.

68.     From 2008 to 2010 PPMS did not contain all uses of force that are

required to be reported in MPD "Use of Force Incident Report" forms or otherwise are

the subject of a criminal or administrative investigation by the Department.

69.     From 2008 to 2010, PPMS did not contain all complaints made to MPD or

Office of Police Complaints.

70.     From 2008 to 2010, PPMS did not contain the results of adjudication of all

investigations (whether criminal or administrative) and a chronology or other complete

historical record of all tentative and final decisions or recommendations regarding

discipline, including actual discipline imposed or non-disciplinary action taken.

71.     From 2008 to 2010, PPMS did not contain all criminal proceedings

initiated, as well as all civil or administrative claims filed with, and all civil lawsuits

served upon, the City, or its officers, or agents, resulting from MPD operations or the

actions of MPD personnel.

72.     From 2008 to 2010, PPMS did not contain all training history.

73.     From 2008 to 2010, PPMS did not contain all management and

supervisory actions taken pursuant to a review of PPMS information, including non-

disciplinary actions.

74.     From 2008 to 2010, PPMS did not include, for the incidents included in

the database, appropriate additional information about involved officers (e.g., name and

badge number), and appropriate information about the involved members of the public

(including demographic information such as race, ethnicity, or national origin).

Additional information on officers involved in incidents (e.g., work assignment, officer

partner, field supervisor, and shift at the time of the incident) are not determinable from PPMS.

75.     From 2008 to 2010, PPMS was not used on a regular basis by managers and supervisors to review and analyze all relevant information in PPMS about officers under their supervision to detect any patter or series of incidents that indicate that an officer, group of officers, or an MPD unit under his or her supervision may be engaging in at-risk behavior.

76.     From 2008 to 2010, PPMS was not used to determine when at-risk behavior may be occurring and therefore appropriate managers and supervisors did not rely on PPMS in determining whether to undertake a more intensive review of the officer's performance.

77.     From 2008 to 2010 PPMS was not used on a regular basis by managers to review and analyze relevant information about subordinate managers and supervisors in their command regarding the subordinate's ability to manage adherence to policy and to address at-risk behavior.

78.     From 2008 to 2010, PPMS was not used regularly by appropriate managers to evaluate officer performance citywide and to evaluate and make appropriate comparisons regarding the performance of all MPD units in order to identify any patterns or series of incidents that may indicate potential liability or other at-risk behavior.  PPMS was not used to evaluate the performance over time of individual units, and to compare the performance of units with similar responsibilities.

79.     From 2008 to 2010, relevant and appropriate information in PPMS was not considered in connection with the adjudication of misconduct allegations and determinations of appropriate discipline for sustained misconduct allegations.

80.     From 2008 to 2010, MPD did not train and thereafter hold managers and supervisors accountable, consistent with their authority, for risk management and for use of PPMS and any other relevant data to address at-risk behavior, or to deal with potential or actual police misconduct.

81.     For example, Lt. Terry-Weeks did not use PPMS for any of its intended functions described above.

82.     From 2008 to 2010, the data that needs to be inputted into PPMS in order for it to perform its functions was not routinely inputted.

83.     To the extent that the MPD's actions and omissions from 2010 to 2013 can be inferred to evidence deliberate indifference at the time of the incident involving Plaintiff, Plaintiff avers that the alleged deficiencies recited above which refer to the period from 2008 to 2010 were also present in the period after the incident involving Plaintiff up until the present.

*Failure to Adequately Investigate Use of Force and Discipline MPD Officers: Problems with the Disciplinary System*

84.     One of the purposes of MPD's disciplinary system is to ensure that misconduct is addressed.  By ensuring that misconduct is addressed, future violations can be prevented.

85.     A discipline system can ensure that future violations are less likely because once an officer is disciplined, in the future the officer is less likely to commit misconduct.

86.     A discipline system can also ensure that future violations are less likely in the department as a whole because if a member is aware that disciplinary action has been

taken against other members, the member would be less likely to engage in misconduct him or herself.

87.    At MPD, however, there is no official way for members to find out that other members have been disciplined.

88.    MPD does not put out a list of members who have been disciplined.

89.    MPD's disciplinary system does not ensure that future violations are less likely in the department as a whole because members are not generally aware that disciplinary action has been taken against other members.

90.    MPD's disciplinary system is also deficient in that if no adverse action notice is issued within 90 days from the day the Department knew or should have known of the misconduct, no adverse actions can be taken against the member, no matter how severe the misconduct.

91.    MPD's disciplinary system is also deficient in that if no final notice is issued within 55 days from the day the Department has served notice on the member, no adverse actions can be taken against the member, no matter how severe the misconduct.

92.    According to Chief Lanier, officers who have committed "egregious misconduct" and "serious offenses" remain at MPD as a result of the 55-day policy.

93.    MPD's disciplinary system is also deficient in that the Department often orders internal affairs investigators to reach certain conclusions.

94.    For example, in the summer of 2008 alone, internal affairs investigator Lashon Jones-Warren did not write critical parts of the report she was assigned to complete as to 18 officers. She had concerns that the language in her report was "not precisely accurate," but signed off on it anyway because she felt she was ordered to.

95.    After reviewing the cases of the 18 officers, one independent arbitrator declared that the internal affairs investigations were "a sham" and "a travesty."

96.     As Kris Bauman, head of the District's police union observed about the 55-day policy, "Bad cops skate on technicalities."

97.     MPD very rarely takes disciplinary action against members for excessive use of force.

98.     For example, in 2012, of the over 700 cases referred to Captain Michael Gottert, Office of Professional Responsibility, less than five, and possibly none, involved excessive use of force. Captain Michael Gottert reviews cases in which adverse action was recommended and he determines what discipline is appropriate.

99.     Captain Michael Gottert reviewed two excessive force cases over the course of his tenure at OPR for which he recommended termination.  In both cases he was overruled and none of the officers were terminated.

100.    Captain Michael Gottert's experience is not unusual.  There has not been a single MPD employee terminated in at least the last ten years for excessive use of force.

101.    OPR's database of disciplinary action is not comprehensive because it does not contain disciplinary action that occurred through the chain of command.

102.    In fact, there is no database of disciplinary actions that occurred through the chain of command.  It is therefore not possible for managers and supervisors to detect patterns of excessive use of non-serious force. Further, because FIT was understaffed and overwhelmed, may serious use of force incidents were investigated by the chain of command and therefore managers and supervisors could not always detect patterns of excessive use of serious force.

103.    In a progressive discipline system, a first incident of misconduct is punished less severely than a subsequent incident of misconduct.  MPD uses a progressive discipline system, but its system is deficient in that a member could commit

multiple acts of misconduct yet be disciplined for each as a first incident if the offenses are in different categories of misconduct.

104.    OPR is not regularly notified about the outcome of civil cases and therefore, when evaluating appropriate discipline, does not take into consideration whether an officer has been found by a court or jury to have committed misconduct.

105.    OPR staff are not given any formal training, other than on-the-job training, before being responsible for determining what discipline is appropriate.

106.    As a result of the deficient disciplinary system, there is not a general sense among MPD members that they could be disciplined.

107.    As a result of the deficient disciplinary system, there is a feeling among some officers that they will not disciplined no matter what they do.

108.    Managers and supervisors are unable to detect whether there are problems with officer misconduct by examining performance reviews because there are very few poor performance reviews, and officers that commit misconduct frequently have good performance reviews.

109.    The DISTRICT OF COLUMBIA fails to adequately discipline its officers who engage in excessive use of force.

110.    As an example of the scope of the problem of inadequate discipline, Lt. Terry-Weeks has performed hundreds of administrative investigations into complaints of excessive use of force, but not a single one has ever resulted in discipline.

111.    In every case in which Lt. Terry-Weeks found that the officer had committed the alleged conduct, the officer was not disciplined.

112.    If an investigator's superior believes that the investigator reached the incorrect outcome, the superior has authority to prepare a cover sheet disagreeing with the outcome.

113.    The investigator's superior does not conduct any independent investigation but merely rubber stamps the conclusion of the investigator.  For example, no superior had ever disagreed with the outcome Lt. Terry-Weeks reached after her investigation.

114.    On information and belief, Lt. Terry-Weeks' record of not disciplining any officers for excessive use of force is comparable to the records of other MPD lieutenants.

*Failure to Adequately Investigate Use of Force and Discipline MPD Officers: Blocking the Office of Police Complaints From Performing Its Function*

115.    By 2010, many MPD officers were refusing to cooperate with Office of Police Complaints investigations.  In 30% of such cases, however, MPD officials exonerated the officers.  The prior year it was 32%.  MPD has refused to provide to OPC an explanation for most of these exonerations and those explanations that were provided were improper.  By undermining the function of OPC, MPD prevented OPC from performing its monitoring function.

116.     In testimony before the D.C. Council in March 2010, the Executive Director of OPC explained that they were not getting the documentation they needed from MPD to perform their monitoring function, leaving OPC as essentially a "paper tiger."

117.    As of 2010, MPD did not provide to OPC documents explaining the resolution of complaints filed with MPD or decisions about what discipline to apply to complaints filed with OPC.  Without the ability to look at how MPD made decisions about whether to discipline members and what type of discipline to impose, OPC was unable to provide meaningful oversight.

23

118.    Bill 18-130 attempted to address some of these concerns but the legislation never came up for a vote and never became law.

*Failure to Adequately Investigate Use of Force and Discipline MPD Officers: MPD Culture Tolerating or Encouraging Use of Force*

119.    The Department of Justice's 2001 report put the DISTRICT OF COLUMBIA on notice that there was a pattern or practice of MPD officers using excessive force.

120.    As a result of the Memorandum of Agreement signed between MPD and the Department of Justice, the DISTRICT OF COLUMBIA was on notice that its disciplinary system was deficient and that investigators were systematically failing to conduct thorough and unbiased investigations.

121.    Pursuant to the Memorandum of Agreement, the DISTRICT OF COLUMBIA was to implement certain reforms to remedy the problems with excessive use of force.

122.    To the extent that the DISTRICT OF COLUMBIA implemented any of the reforms relating to its disciplinary system and investigations into the use of force, these reforms had all been abandoned by October 2010.  The DISTRICT OF COLUMBIA knew or should have known that by abandoning or failing to implement the reforms, it would again (or continue to) have a deficient disciplinary system and inadequate investigations into the use of force.

123.    By October 2010, the policies, practices, and customs described in this Complaint had led many MPD members to conclude that they can commit acts of excessive force with impunity.

24

124.     The failure to adequately investigate use of force and to adequately discipline MPD officers led to the development of a culture at MPD, by October 2010, that condoned use of excessive force.

125.     The result was a dramatic increase in complaints to OPC for excessive use of force immediately after the monitoring period ended.

126.     One aspect of this culture condoning use of excessive force was that for at least the last ten years, no MPD officer has been arrested by another MPD officer for a violation of D.C. Code § 5-123.02 (prohibiting officers from using wanton or unnecessary force), despite numerous occasions on which MPD officers witnessed other officers from using wanton or unnecessary force.

127.     Whether or not individual MPD officers are aware of the precise facts laid out in this Complaint, by October 2010, they perceived that any investigation into their misconduct would not lead to disciplinary action against them.

128.     The DISTRICT OF COLUMBIA should have known about the culture at MPD which condoned excessive force.  To the extent that the DISTRICT OF COLUMBIA did not have actual knowledge of a pattern or practice of excessive use of force, this was the result of a deliberate policy choice to turn a blind eye to the problem.

129.     Specifically, the DISTRICT OF COLUMBIA deliberately failed to take the steps necessary, described in this Complaint, to detect patterns of excessive use of force citywide.

130.     None of the individual defendants in this case are aware of the name of any MPD officer who had ever been disciplined for excessive use of force.

131.     Further, the individual defendants in this case believed that they would not receive any disciplinary action in regard to their use of force against Plaintiff and in fact they did not.

132.    The fact that three officers and their sergeant could all engage in the use of excessive force against Plaintiff and not fear that they would be disciplined is powerful evidence that MPD's culture of tolerating excessive force was a moving force behind the defendants' use of excessive force against Plaintiff.

*Denial of Access to Asthma Inhaler*

133.    Plaintiff suffers from severe asthma.  He must carry an asthma inhaler with him at all times and use it at least twice a day, or else risk an acute asthma attack which could be fatal.

134.    At the time of his arrest, Plaintiff was carrying with him a prescription albuterol inhaler.

135.    The albuterol inhaler had been prescribed to Plaintiff by a licensed physician for use during asthma attacks.

136.    During the booking process at Second District, Plaintiff asked Officer Todd Cory if he could keep his inhaler in his possession and Officer Todd Cory told him that he could not because it had to go to "property."

137.    Plaintiff told Officer Cory that he usually needs to use his inhaler in the morning and at night.  Officer Cory informed Plaintiff that if he needed treatment he would need to go to the emergency room.

138.    After Officer Cory removed Plaintiff's albuterol inhaler, Officer Cory inspected it, confirmed that it was not a weapon, and gave it to MPD Officer Adam Crist.

139.    MPD Officer Adam Crist listed Plaintiff's albuterol inhaler on the Second District property book and turned it over to the Station Clerk, Officer Francine Tinsley,

who verified and signed for the property.  Plaintiff's albuterol inhaler was then placed into the evidence control room at Second District.

140.    The MPD officers' actions in removing Plaintiff's albuterol inhaler and turning it over to the property clerk were taken in accordance with the official policy of the DISTRICT OF COLUMBIA as it existed at the time.

141.    As of October 2010, the official policy of the DISTRICT OF COLUMBIA, as reflected in General Order 601.01, was that all personal property belonging to an arrestee, except personal identification and currency under $100, must be turned over to the Station Clerk.

142.    More specifically, as of October 2010, the official policy of the DISTRICT OF COLUMBIA, as reflected in the Holding Facilities Standard Operating Procedure was: "All medication, both prescription and over-the-counter, shall be recovered from prisoners, itemized and stored in a secure location and identified as the prisoner's property, in accordance with GO-SPT-601.01 (Recording, Handling and Disposition of Property Coming into the Custody of the Department)."

143.    As of October 2010, the DISTRICT OF COLUMBIA had no policy specifically related to an arrestee's access to an albuterol inhaler which was in his possession at the time of arrest.

144.    The District's practice, however, was to deny an arrestee access to needed medical devices and instead, as the District states in its interrogatory response in this case, "to allow an arrestee who complained of an injury or need for a medical device to prepare a PD-313 and the arrestee would be transported to the hospital."

145.    The District knew to a moral certainty that some individuals in police custody would have asthma or other diseases or conditions which required access to medication or medical devices.  The risk of serious harm to individuals with asthma or

other diseases or conditions caused by denying access to their medication or medical devices was so obvious that the District knew or should have known of the need to implement appropriate policies.

146.    Even if the risk of serious harm to individuals with asthma or other diseases or conditions was not obvious, the District was placed on notice that such policies were necessary after the estate of Leroy Waters, Jr. filed a lawsuit alleging that the decedent suffered an asthma attack and died after the police took his prescription asthma medication from him.  *Estate of Waters v. District of Columbia, et al.*, No. 2044 CA 1308 (Super. Ct. 2004, filed); *Estate of Waters v. District of Columbia, et al.*, No. 1:02-cv-167 (EGS)(D.D.C. 2002, filed).

147.    While at Second District, Mr. Westfahl began to experience asthma exacerbation (i.e., an "asthma attack").

148.    Plaintiff alerted an Unknown Second District MPD Officer, who was nearby, that he was experiencing an asthma attack and requested that he be allowed access to his albuterol inhaler.

149.    Plaintiff was not provided with access to his albuterol inhaler.  Instead, he was made to wait for approximately 30 minutes and then transported to a hospital emergency room.

150.    During the time Plaintiff was made to wait, it became increasingly difficult for Plaintiff to breathe and by the time he arrived at the hospital emergency room he had to be administered an albuterol nebulizer.

151.    The applicable standard of care requires that an arrestee's albuterol inhaler be made available for administration in a timely manner in the event that it is needed.

152.    If Plaintiff's inhaler had been available for administration to him in a timely manner, his asthma attack would have subsided.

28

*Other Allegations*

153.    At all times referenced above, all of the individually named Defendants were acting under color of District of Columbia law, with the exception that the individual Defendants were not acting within the scope of their duties as police officers when they falsely completed or conspired to complete a false police report to cover up the excessive use of force against Plaintiff.

154.    On April 7, 2011, Plaintiff, through counsel, submitted the appropriate and required notice of his intent to sue the District of Columbia.

COUNT I:
VIOLATION OF THE FIRST AMENDMENT
(DEFENDANTS THAU, ROBINSON, CORY AND MACK)

155.    This Count re-alleges and incorporates by reference all of the preceding paragraphs.

156.    Defendants Thau, Robinson, Cory and Mack violated Plaintiff's First Amendment rights by beating him in retaliation for his lawful exercise of his First Amendment rights by marching in a demonstration. Defendants Thau, Robinson, Cory and Mack would not have beaten Plaintiff but for his lawful exercise of his First Amendment rights by marching in a demonstration.

COUNT II:
VIOLATION OF THE FOURTH AMENDMENT
(DEFENDANTS THAU, ROBINSON, CORY, AND MACK)

157.     This Count re-alleges and incorporates by reference all of the preceding paragraphs.

158.     Defendants Thau, Robinson, Cory, and Mack violated Plaintiff's Fourth Amendment rights by using excessive force against him in the process of effecting his arrest.

159.     Defendant Cory violated Plaintiff's Fourth Amendment rights by arresting him without probable cause.


<u>COUNT III:</u>
<u>VIOLATION OF THE FOURTH AMENDMENT</u>
<u>(DEFENDANT DISTRICT OF COLUMBIA)</u>


160.     This Count re-alleges and incorporates by reference all of the preceding paragraphs.

161.     The District is liable for its deliberate indifference to violations of citizens' Fourth Amendment rights, as described throughout this Complaint.


<u>COUNT IV:</u>
<u>VIOLATION OF THE FIFTH AMENDMENT</u>
<u>(DEFENDANT DISTRICT OF COLUMBIA)</u>


162.     This Count re-alleges and incorporates by reference all of the preceding paragraphs.

163.     The District is liable for its practice of denying arrestees access to needed medical devices and instead transporting the arrestee to the hospital.


<u>COUNT V:</u>
<u>FALSE ARREST / FALSE IMPRISONMENT</u>
<u>(TODD CORY, DISTRICT OF COLUMBIA)</u>

164.    This Count re-alleges and incorporates by reference all of the preceding paragraphs.

165.    Officer Todd Cory illegally arrested and imprisoned Plaintiff against his will without probable cause.

166.    Defendant District of Columbia is liable under the theory of *respondeat superior*.

COUNT VI:
ASSAULT AND BATTERY / EXCESSIVE FORCE
(ALL DEFENDANTS)

167.    This Count re-alleges and incorporates by reference all of the preceding paragraphs.

168.    The individually named defendants, acting individually or in concert, did assault and batter Plaintiff and used excessive force in effecting his arrest.

169.    Once Plaintiff was under the custody and control of one or more of the defendants, the individually named defendants who did not personally beat Plaintiff knew that the defendants who did beat Plaintiff were acting unlawfully and had a reasonable opportunity to prevent the harm, but chose not to act.

170.    As a result of Defendants' wrongful actions, Plaintiff suffered physical injury, pain, suffering, emotional distress, humiliation, and mental anguish and anxiety and other injuries and damages.

171.    Defendant District of Columbia is liable under the theory *of respondeat superior*.

COUNT VII:
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(ALL DEFENDANTS)

172.    This Count re-alleges and incorporates by reference all of the preceding paragraphs.

173.    The individually named defendants, acting individually or in concert, intentionally committed the extreme and outrageous actions described in this Complaint, causing Plaintiff to suffer severe emotional distress.

174.    Defendant District of Columbia is liable under the theory of *respondeat superior*.

COUNT VIII:
NEGLIGENCE
(DISTRICT OF COLUMBIA)

175.    This Count re-alleges and incorporates by reference all of the preceding paragraphs.

176.    The Station Clerk and the Unknown Second District MPD Officer, on behalf of the DISTRICT OF COLUMBIA, owed a duty to SHAWN WESTFAHL to ensure that his prescription albuterol inhaler, once turned over to the Station Clerk, would still be available to be administered to him promptly in the event that he had an asthma attack.

177.    By failing to make Plaintiff's albuterol inhaler promptly available for administration to him, the Station Clerk and Unknown Second District MPD Officer, agents of the DISTRICT OF COLUMBIA, breached the duty owed to SHAWN WESTFAHL to ensure that his albuterol inhaler would be administered to him promptly in the event that he had an asthma attack.

178.    The Station Clerk and Unknown Second District MPD Officer's breach of the duty to ensure that SHAWN WESTFAHL's albuterol inhaler would be administered to him promptly in the event that he had an asthma attack was the proximate cause of Plaintiff's injuries.

179.    SHAWN WESTFAHL suffered injuries as a result of not having his albuterol inhaler promptly administered to him, causing him pain and suffering and necessitating transport to a hospital emergency room for administration of a nebulizer.

180.    Defendant DISTRICT OF COLUMBIA is liable for the tortious conduct of the Station Clerk and Unknown Second District MPD Officer under the theory of *respondeat superior*.


COUNT IX:<br>
ABUSE OF PROCESS<br>
(ALL DEFENDANTS)

181.    This Count re-alleges and incorporates by reference all of the preceding paragraphs.

182.    OFFICER TODD CORY, OFFICER ROBERT ROBINSON, OFFICER DANIEL THAU, and SERGEANT CRAIG MACK conspired to prosecute SHAWN WESTFAHL for crimes he did not commit.

183.    The conspiracy occurred on October 10, 2010 in Washington, D.C. between and amongst OFFICER TODD CORY, OFFICER ROBERT ROBINSON, OFFICER DANIEL THAU, and SERGEANT CRAIG MACK.

184.    The conspiracy was intended to fabricate a *post hoc* justification for the use of excessive force by OFFICER TODD CORY, OFFICER ROBERT ROBINSON, OFFICER DANIEL THAU, and SERGEANT CRAIG MACK.

185.     Each of the co-conspirators agreed that SHAWN WESTFAHL should be prosecuted for crimes he did not commit in order to intimidate SHAWN WESTFAHL into not seeking to bring a civil action against the co-conspirators.

186.     Each of the co-conspirators had a personal stake in the conspiracy which was independent of the interests of the DISTRICT OF COLUMBIA.  Specifically, each of the co-conspirators sought to avoid civil liability for their own wrongful actions.

187.     In furtherance of the conspiracy, OFFICER TODD CORY made false statements in a police report accusing SHAWN WESTFAHL of crimes he did not commit.

188.     In his report, OFFICER TODD CORY accused SHAWN WESTFAHL of striking a police officer with a stick and committing felony assault on a police officer (political hate crime) while knowing that these accusations were false.

189.     As a result of the false statements made by OFFICER TODD CORY, legal process issued for the commencement of a criminal prosecution against SHAWN WESTFAHL for crimes he did not commit.

190.     The use of criminal process to avoid responsibility for misconduct is an attempt to use process to obtain an end without the regular purview of process.

191.     The DISTRICT OF COLUMBIA is liable under the theory of *respondeat superior* for the acts of abuse of process committed by OFFICER TODD CORY.


<u>COUNT X:</u>
<u>DEFAMATION</u>
<u>(ALL DEFENDANTS)</u>


192.     This Count re-alleges and incorporates by reference all of the preceding paragraphs.

34

193.    OFFICER TODD CORY, OFFICER ROBERT ROBINSON, OFFICER DANIEL THAU, and SERGEANT CRAIG MACK conspired to make false statements accusing SHAWN WESTFAHL of committing crimes he did not commit.

194.    The conspiracy occurred on October 10, 2010 in Washington, D.C. between and amongst OFFICER TODD CORY, OFFICER ROBERT ROBINSON, OFFICER DANIEL THAU, and SERGEANT CRAIG MACK.

195.    The conspiracy was intended to fabricate a *post hoc* justification for the use of excessive force by OFFICER TODD CORY, OFFICER ROBERT ROBINSON, OFFICER DANIEL THAU, and SERGEANT CRAIG MACK.

196.    Each of the co-conspirators agreed to the conspiracy.

197.    Each of the co-conspirators had a personal stake in the conspiracy which was independent of the interests of the DISTRICT OF COLUMBIA.  Specifically, each of the co-conspirators sought to avoid civil and criminal liability for their own wrongful actions.

198.    In furtherance of the conspiracy, OFFICER TODD CORY made false statements in a police report accusing SHAWN WESTFAHL of crimes he did not commit.

199.    In his report, OFFICER TODD CORY accused SHAWN WESTFAHL of striking a police officer with a stick and committing felony assault on a police officer (political hate crime) while knowing that these accusations were false.

200.    The DISTRICT OF COLUMBIA is liable under the theory of *respondeat superior* for the acts of defamation committed by OFFICER TODD CORY.


WHEREFORE, Plaintiff Shawn Westfahl respectfully requests the following relief:

1.  A declaration that the Defendants violated Plaintiff's statutory and constitutional rights.

2.  Judgment against the Defendants, jointly and severally, in the amount of $1,000,000, or such other amount as may be awarded by the jury, as and for compensatory damages, plus interest and costs.

3.  Judgment against the Defendants, individually, each in the amount of $1,000,000, or such other amount as may be awarded by the jury, as and for punitive damages, plus interest and costs.

4.  An award of attorneys fees and other litigation costs reasonably incurred in this action.

5.  Such other and further relief as the Court deems proper.

Respectfully Submitted,

___/s/ JeffreyLight_____
Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington , DC 20006
 (202)277-6213

And

 _/s/ Daniel E. Schultz_____
Daniel E. Schultz, Esquire, #11510
1050 17th Street, NW
Suite 1250
Washington, D.C. 20006
(202) 452-1120

*Attorneys for Plaintiff*

<u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues.

___/s/ JeffreyLight_____
Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington , DC 20006
 (202)277-6213


        And

__/s/ Daniel E. Schultz_____
Daniel E. Schultz, Esquire, #11510
1050 17th Street, NW
Suite 1250
Washington, D.C. 20006
(202) 452-1120

*Attorneys for Plaintiff*