IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**SHAWN WESTFAHL,**

    **Plaintiff,**

v.                                                                    Case No. 1:11-cv-2210 (RLW)

**DISTRICT OF COLUMBIA, et al.,**

    **Defendants.**

---

**PRELIMINARY EXPERT REPORT OF LOU REITER**

1. My name is Lou Reiter. I have been actively involved in police practices and law enforcement since 1961. I was an active police officer for 20 years. Since my retirement in 1981 as an active police officer, I have been involved in police and law enforcement practices as a private police consultant.

2. Since 1983 I have been providing law enforcement consultation in police training and management. I provide law enforcement training in the following areas:

   - Investigation of critical incidents - officer involved shootings, use of force, and pursuits.
   - Managing the Internal Affairs function.
   - Police discipline.
   - Use of force and deadly force issues.
   - Police pursuit issues.
   - Investigative procedures and supervision.
   - Jail intake procedures
   - Personnel practices.
   - Supervisory techniques
   - Crowd control procedures.
   - Liability management.

1

- Policy and procedure development.
- Management effectiveness.

I consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization. My primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.

3. Since 1983, I have been retained in over 1100 police related cases. This involvement has been on a mix of approximately 2/3 plaintiff and 1/3 defense. Assistance provided includes case analysis and development and expert witness testimony. I have been qualified in state and Federal courts, including the District of Columbia and Puerto Rico, to provide trial testimony in many areas including:

- Field procedures including tactics, arrest techniques and pursuits.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures.
- Jail intake procedures
- Police management and personnel practices.
- Investigation of citizen complaints and discipline.
- Police policy and procedures development.
- Police training.

2

4. I am a former Deputy Chief of Police of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over twenty years until I retired in 1981. During that period of time I served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer. I was involved in police training, investigating allegations of police misconduct, Chairman of the Use of Force Review Board, member of the Unusual Occurrence Command Post Cadre, and researcher and author of the chapters on internal discipline, training and management/employee relations for the Police Task Force Report of the National Advisory Commission on Criminal Justice Standards and Goals. In 1993 I published the manual/guide Law Enforcement Administrative Investigations; the Second Edition in 1998, and the current Third Edition in 2006.

5. My experience, training and background is more fully described in the attached resume. A complete list of my testimony during the past four (4) years is attached.

6. I have reviewed the following materials to date regarding this case:
   - Second Amended Complaint
   - Klotz expert reports (2)
   - Use of Force reports of officers
   - Supervisory memos of incident
   - On-scene Force Assessment Form Lt. Figueras
   - Report of Lt. Terry-Weeks
   - Memos on review/approval of force investigation reports
   - Memo requesting additional investigation by Patrol Bureau
   - Affidavits of Ben Biros and Max Ace
   - Westfahl arrest and injury reports
   - Event summaries
   - Photographs and video of incident and Westfahl injuries

- Selected personnel file documents of officers
- MPD SOP "Demonstrations"
- MPD GO "Property"
- MPD GO "Serious Misconduct"
- MPD GO "Processing citizen complaints"
- MPD GO "Fire/Police Disciplinary Action"
- SOP "Holding Facility," "Use of Force," "Use of Force Investigations," and "Use of Force Review Board"
- IMP/World Bank Fall Meeting Incident Action Plan
- MOU between USDOJ and MPD and quarterly/final monitor reports
- Training lesson plans on use of force and arrest, search and seizure
- Depositions
  - Robert Klotz
  - Shawn Westfahl
  - Officer Todd Cory
  - Officer Craig Mack
  - Officer Robert Robinson
  - Officer Daniel Thau
  - Captain M. Gottert
  - Sgt. R. Ehrlich
  - Commander S. Sun
  - Officer H. Deolo
  - Sgt. L. Washington
  - Chief J. Maupin
  - Lt. D. Terry-Weeks
  - Lt. R. Figueras

7. My opinions are based upon the totality of my specialized knowledge in the field of police practices. This experience is derived from my personal police experience, knowledge and training. This expertise has been developed during my 52 years involvement in law enforcement at all various capacities as a practitioner and my continued experience as a trainer, auditor and litigation consultant. This experience has provided me with extensive personal and specialized training, experience and knowledge of police operations and generally accepted police practices. The body of knowledge that I have reviewed over the years coupled with my personal and professional experiences, my continued auditing of

police agencies, my constant training of police supervisors, managers and executives, my continuous interaction with other police professionals, organizations and training personnel, all form the foundation for the opinions I am rendering in this matter.

There is a large body of knowledge and literature about the practices and standards that modern, reasonably managed and administered police agencies across the U.S. should follow and apply to its operations.  These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective and legal.  Many of these generally accepted practices have been developed from law enforcement critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies and employee misconduct.  These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds.  I am familiar with this body of knowledge and through my continuous training and audits assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

This is equally applicable of the police response to crowd management, unruly crowds, unlawful assemblies and civil disobedience demonstrations.  I have personal and professional experience in this area

5

of police practices.  During my tenure with the LAPD at all ranks, I was personally involved in crowd control, supervision and/or management/planning for over 15 years.  These involved urban riots, school unrest, sports celebratory events, large (200-500) person private parties, labor movement protests, and political protests specifically during the Civil Rights Movement and Vietnam War.  Other than equipment, very little has changed in this aspect of police activity.  I have been involved in several other litigation matters involving police crowd control since the World Trade Organization (WTO) conflicts in Seattle in 1999.  I am aware of the continuing developments in the critiques of these crowd control incidents, police periodical writings, incident critiques, and model policies of the International Association of Chiefs of Police.  I have conducted training during the past several years to police audiences on reasonable demonstration control practices.

My examination of the factors involved in this police practices case embodies the basic fundamentals which I employ in my professional examination of police agencies during my audits and when working as a consultant with the U.S. Department of Justice.  My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

The terminology I use in my Expert Report is not meant to invade the purview of the court or the final jury determination.  I use these terms in my training of police supervisors, managers and command

6

officers when instructing on administrative investigations and civil liability. These are products of my continuous review of case law that should guide a reasonable police agency in supervising its employees. These terms have become common terms within law enforcement supervision, management and risk management; just as the terms of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

8.   This expert report will address three (3) police practices issues involved in this litigation: (1) use of force, (2) provision of medical treatment, and (3) supervisory/agency response.

9.   It is my understanding that the following events occurred leading to this litigation: On October 9, 2010, the IMF World Bank was conducting a meeting in the District of Columbia. Protesters gathered and eventually marched through downtown streets. During the police attempt to control and redirect the movement of the crowd, an encounter occurred between Plaintiff Westfahl and MPD officers. Force was used to control Mr. Westfahl to affect his arrest.

10.   I am aware that there are divergent versions of the events of this incident involving Mr. Westfahl. I am not making any credibility determinations and believe that it would not be appropriate for someone like myself to do so without first hand knowledge of the incident or personal contact with the parties. My opinions are based upon the various

versions being presented in this litigation and then analyzed based upon my specialized knowledge, experience and training in police practices.

11. **The officers' uses of force, in my opinion based upon my review of the materials in this matter and my specialized knowledge, skills and experience, were objectively reasonable and consistent with generally accepted police practices for the circumstances involved in this encounter.**

12. Reasonable police officers are trained in the legal and operational aspects of use of force. Use of force training all must conform to the Supreme Court decisions and state law. This training has become national in scope. Model policies on use of force are promulgated by several national guidance bodies such as the International Association of Chiefs of Police. Police officers are provided with laws, models and subject control tactics to use. These are designed to be within the parameters of legal uses of force. They are also designed to protect not only the officer involved, but also the subject upon whom force is used. Officers are restricted in the use of force to use only that force which is reasonable and necessary to overcome resistance, comply cooperation and affect an arrest (*Graham v. Conner*). The police training stemming from this case and generally accepted by police practitioners is that the force used by officers must be evaluated on the seriousness of the crime, the level of resistance of the subject, the continuing threat to officers and others, and whether the subject is capable of resisting arrest and fleeing. They are trained and

told that they are allowed to use more force than the level of resistance used by the subject to ensure that the subject is effectively controlled. This is often referred to as "control superiority" and "one plus one" concepts. Officers are expected to control the situation in order to be able to investigate and resolve the incident.

13. This use of force training is usually complemented by the use of some form of use of force/control/subject resistance matrix, continuum or graphic. These are very similar in the basic content. They identify levels of subject resistance and types of officer reaction/response to this resistance. The graphics are designed to demonstrate visually to police officers, trainees and others viewing the document the reasonable relationship between what a subject being arrested/restrained does and the officer's response. Common to these graphics are subject levels of resistance such as verbal, passive, active, assaultive, aggressive and aggravated. Common descriptors used for officer response are presence, verbal, soft hand control, chemical agents, hard hand control, transporters, intermediate, incapacitating and deadly force.

14. These concepts are consistent with the written policies and training materials of the MPD and the deposition testimony of the officers and their understanding of the annual in-service training they have received.

15. The decision to redirect the movement of the protesters is adequately described by the testimony and reports of the officers. In one of the videos it can be seen that a supervisory officer is giving the controlled

protesters directions on how to leave the scene peacefully in lieu of arrest. This apparently did occur after the encounter with Mr. Westfahl, but is indicative that the police did not exhibit any animus towards the protesters. Other protesters in the group with Mr. Westfahl were also carrying signs similar in content and construction to that which he carried.

16. The videos of the incident and still photographs are demonstrative. They do show Mr. Westfahl with the sign fastened to a pole. The exact contact of the pole on Officer Robinson is not clear in any of the video evidence. Mr. Westfahl denies that he struck any officer. All four officers have written and testified that the pole did make contact with the bike helmet worn by Officer Robinson and that the pole ended up being broken. What the videos and photographs do depict is the controlled manner in which the encounter and arrest of Mr. Westfahl occurred. While there were many officers present, only four were directly involved with the control and arrest of Mr. Westfahl. It can be seen that other officers were controlling the protesters not involved in the encounter.

17. Surprisingly, the testimony of all persons including Mr. Westfahl and the affidavits of Ace and Biros, are relatively consistent with one exception. Mr. Westfahl denies that he struck Officer Robinson or that he provoked any officer. Neither witness in their affidavits observed this aspect of the encounter. Mr. Westfahl testified in his deposition that he was "grab…like a bear hug and twist me to the ground…"(55); that he had one arm "pinned underneath me…"(58); "As I was on the pavement, I felt blows to

my abdomen, blows to my head, and I remember being struck by something hard in the back…I believer they were fists."(68); and that his forehead struck the pavement "as I was being pulled down."(105)

18. Officer Robinson testified and can be seen ordering the protesters to step back. Most of the remaining videos and photographs depict what occurred while the officers and Mr. Westfahl were on the ground. Officer Thau initially attempted to strike Mr. Westfahl in the upper arm and ended up striking him in the lower back as he moved. Officers Robinson and Mack did a tactical takedown and were assisted by Officer Thau. All three ended up on the ground with Mr. Westfahl. During the process of handcuffing Mr. Westfahl, Officer Cory used several fist strikes to Mr. Westfahl's side to assist in securing his uncuffed arm. These officer actions were similar to the description of the contact given by Mr. Westfahl and Mr. Ace in his affidavit.

19. Police defensive tactics and subject control techniques are designed to get the subject being controlled to the ground. These tactics place the subject in a position of disadvantage on the ground, usually on his stomach, and allow for more controlled handcuffing. The "tactical takedown" described by the officers is consistent with these generally accepted police practices. Some agencies refer to it as a "swarm" tactic, but the end result is designed to get the subject on the ground.

20. Officer Thau testified that he used his ASP baton to deliver a strike to Mr. Westfahl's upper body arm area, but his movement ended up causing the

force of the strike to be to his lower back.  All of these are acceptable strike zones for an officer's use of any impact tool.  They are areas of large muscle mass often highlighted in training graphics by yellow and green zones and are not the vulnerable areas designated by red in common impact strike zones.  The photographs of Mr. Westfahl appear to depict a baton strike to his back just above his buttocks.  Mr. Westfahl acknowledged during his deposition that the bruising to his forehead was most likely a result of his being taken to the pavement and when his head scraped the pavement.

21. Officer Cory testified that he delivered several closed fist strikes to Mr. Westfahl's side when he was on the ground on his stomach and being ordered to remove his arm from under his body to allow handcuffing.  Officer Cory termed this "softening blows."  These are commonly taught to police officers and are also referred to as "distraction strikes."  They are intended to refocus the subject's mind on the strike and when not cooperating with the commands to expose his arm(s) for handcuffing.  When a subject is resting on his/her arm, it is extremely difficult to forcibly remove it for the handcuffing process.

22. **The medical treatment provided to Mr. Westfahl, in my opinion based upon my review of the materials in this case and my specialized skills, knowledge and experience in reasonable and generally accepted police practices, was reasonable and consistent with generally accepted police practices.**

23. Mr. Westfahl, in his complaint and deposition testimony, alleges that his asthma inhaler was taken from him and not given back to him while in custody. This is correct, but it is consistent with generally accepted police practices.

24. His inhaler was listed on his disposition of arrestee's property as "Enhaler." The emergency medical treatment indicated on the Arrestee Injury Report that the initial treatment acknowledged Mr. Westfahl's asthma and "treatment refused by patient against advice of attending physician." When he later was having difficulty breathing in the detention facility and asked for his inhaler, he was transported to the hospital for treatment.

25. Police detention facilities commonly do not allow prisoners to keep any medications while in custody. These facilities are not long-term housing, but considered temporary. Police practices are designed to ensure the safe well being of booked prisoners. Allowing them to keep medications including inhalers would present security and safety concerns for any pre-sentence police detention facility.

26. The documentation and testimony supports that Mr. Westfahl was provided reasonable, consistent and prompt attention to his medical needs.

27. **The supervisory practices of the MPD, in my opinion, were reasonable and consistent with generally accepted police practices.**

28. The extensive written provisions and training documentation of the MPD, specifically in the area of use of force, are reasonable and consistent with

generally accepted police practices. These are designed to ensure that officers' uses of force in the field are reasonable and consistent with written guidelines and training.

29. The use of force reports used by the MPD are very detailed. The officers involved into control and arrest of Mr. Westfahl completed these reports in a reasonable and detailed manner. These reports are consistent with their subsequent testimony in this matter.

30. Lt. Terry-Weeks conducted the overall supervisory investigation of the officers' uses of force. Her report was reviewed at various levels within the agency. This review was not perfunctory as evidenced by the Patrol Bureau's memo requesting specific additional investigative needs. These omissions were met and the report was then further reviewed by the MPD. This documentation and review certainly does not reflect any deliberate indifference on the part of the MPD or its supervisors/managers.

31. There is no documentation or testimony that the officers directly involved in the control and arrest of Mr. Westfahl had a propensity for the use of force.

32. It is unreasonable, in my professional opinion, to make any determination that the custom and practice of a police agency is deliberately indifferent when all that is reviewed is one incident and one supervisory investigation. These types of expert analysis are properly done when there has been an analysis of a volume of instances over a specific period of time. That has not been done in this matter and I am not in a position to make any such

      determination.

33. It is my understanding that additional materials may be in process of being produced or may be requested later.  I would request that this report be considered a preliminary report.  Should any subsequent information be produced and materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

34. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

35. My fees for this professional service is a flat Case Development Fee of $7500 and a fee of $2500 for a deposition in the Atlanta area or $2500 per day plus expenses for services away from the Atlanta area including depositions and trial appearances.

This report is signed under penalty of perjury on this ___ day of September 2013, in Jasper, GA.


                                                Lou Reiter